AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| CELL SITE LOCATION DATA FOR ONE T-MOBILE CELL | ) |
| PHONE AND SEARCH OF INFORMATION ASSOCIATED | ) |
| WITH THE SAME NUMBER IN VIOLATION OF 18 U.S.C. | ) |
| §§ 2251(a), 1470, and 2242(b) | ) |

Case No. 21-SC-2486

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A (incorporated by reference)

Located in the _____ District of New Jersey _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B (incorporated by reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC § 2251(a) (attempted production of child pornography),; 18 USC § 1470 (sending obscene material to a minor),; 18 USC § 2422(b) (enticement and attempted enticement of a minor). | |

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Melia Dickinson, Detective
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
Telephone _____ *(specify reliable electronic means).*

Date: _____ 7/30/2021 _____

_____
*Judge's signature*

City and state: _____ Washington, D.C. _____

G. Michael Harvey
United States Magistrate Judge

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means        ☑ Original            ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )   Case No.  21-SC-2486 |
| CELL SITE LOCATION DATA FOR ONE T-MOBILE CELL | ) |
| PHONE AND SEARCH OF INFORMATION ASSOCIATED | ) |
| WITH THE SAME NUMBER IN VIOLATION OF 18 U.S.C. | ) |
| §§ 2251(a), 1470, and 2242(b) | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of New Jersey _____ .
*(identify the person or describe the property to be searched and give its location)*:

See Attachment  A (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment  B (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before _____ August 12, 2021 _____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ G. Michael Harvey _____ .
                                                                                                *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❒ for _____ days *(not to exceed 30)*   ❒ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____ 7/30/2021 _____        _____
                                                                                        *Judge's signature*

City and state:        _____ Washington, D.C. _____        _____ G. Michael Harvey _____
                                                                                        United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>21-SC-2486 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A-1**

**Property to Be Searched**

1.   This warrant applies to records and information associated with the cellular device assigned to call number (202) 926-5325 from July 27, 2020 to the present ("TARGET PHONE NUMBER"), used by GLENN MATTHEWS, whose service provider is T-Mobile ("PROVIDER"), a wireless communications service provider that is located at 4 Sylvan Way Parsippany, NJ 07054.

2.   Information about the location of the TARGET PHONE NUMBER that is within the possession, custody, or control of PROVIDER, including information about the location of the cellular telephone if it is subsequently assigned a different number.

## **ATTACHMENT A-2**

1.  The subject of this investigation is GLENN MATTHEWS (DOB 05/XX/1989).

**Attachment B**

**Particular Things to be Seized**

I.    **Government procedures for warrant execution**

To the extent that the information described in Attachment A-1 is within the

possession, custody, or control of the PROVIDER, including any information that has been

deleted but is still available to the PROVIDER or that has been preserved pursuant to a

request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose to the

government the following information pertaining to the Account/TARGET PHONE

NUMBER listed in Attachment A-1:

a.  The following information about the customers or subscribers associated with the

TARGET PHONE NUMBER/Account for the time period July 27, 2020 to April

1, 2021:

i.   Names (including subscriber names, user names, and screen names);

ii.   Addresses (including mailing addresses, residential addresses, business
addresses, and e-mail addresses);

iii.   Local and long distance telephone connection records;

iv.   Records of session times and durations, and the temporarily assigned
network addresses (such as Internet Protocol ("IP") addresses) associated
with those sessions;

v.   Length of service (including start date) and types of service utilized;

vi.   Telephone or instrument numbers (including MAC addresses, Electronic
Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"),
Mobile Equipment Identifier ("MEID"); Mobile Identification Number
("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber
Integrated Services Digital Network Number ("MSISDN"); International

Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii.   Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii.   Means and source of payment for such service (including any credit card or bank account number) and billing records, and

ix.   All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the TARGET PHONE NUMBER/Account, including:

    A.   the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

    B.   information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received and

    C.   any and all cell site data and/or data that describes and/or indicates the location of the cellular phone that is the subject of this warrant from July 27, 2020 through April 1, 2021;

    D.   all available per-call measurement data and RTT reports, to include 1X, EVDO, LTE, IP session, and Data.

## II.   Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of 18 USC § 2251(a) (attempt production of child pornography), 18 USC § 1470 (sending obscene material to a minor), 18 USC § 2422(b) (enticement and attempted enticement of a minor), involving GLENN MATTHEWS during the period July 27, 2020 through April of 2021.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the PROVIDER in order to locate the things particularly described in this Warrant.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section I and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF CELL SITE LOCATION DATA FOR ONE T-MOBILE CELL PHONE AND SEARCH OF INFORMATION ASSOCIATED WITH THE SAME NUMBER IN VIOLATION OF 18 U.S.C. §§ 2251(a), 1470, and 2242(b)** | **Case No. 21-sc-2486**<br><br><br>**Filed Under Seal** |

*Subject Account(s): (202) 926-5325*

**AFFIDAVIT IN SUPPORT OF**

**AN APPLICATION FOR A SEARCH WARRANT**

I, **Melia Dickinson**, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41, 18 U.S.C. §§ 2703(a), and 2703(c)(1)(A), and former Chief Judge Hogan's Memorandum Opinion in In the Matter of the Application of the United States for an Order Authorizing the Monitoring of Geolocation and Cell Site Data for a Sprint Spectrum Cell Phone Number ESN, 2006 WL 6217584 at *4 (D.D.C. 2006) (Hogan, C.J.) ("Hogan Opinion"), for information about 1) historic location data for the cellular phone number *(202) 926-5325* **(the TARGET PHONE NUMBER)**, as detailed in Attachment B, whose service provider is T-Mobile ("PROVIDER"), a wireless telephone service provider headquartered at 4 Sylvan Way Parsippany, NJ 07054.  As a provider of wireless

communications service, PROVIDER is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15).

2.       I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. I am a Detective with the Metropolitan Police Department of the District of Columbia (MPDC).  I have been employed by the MPDC since 2013. I am currently assigned as a Special Deputy United States Marshal to the Federal Bureau of Investigation (FBI) / MPDC Child Exploitation Task Force (CETF) and Northern Virginia Regional Internet Crimes Against Children (ICAC) Task Force, where my duties include investigating cases pertaining to the sexual exploitation of children and online offenses involving children, including the production, transportation, distribution, receipt, and possession of child pornography. During my tenure with the MPDC, I have been assigned to the First District Patrol Operations and, since 2018, to the Youth and Family Services Division (YFSD) where I worked in the Physical and Sexual Abuse Branch (PSAB) prior to being assigned to the task force. I have gained experience through training with the MPDC and in my everyday work related to conducting these types of investigations. Moreover, I am a law enforcement officer who is engaged in enforcing criminal laws, including offenses in violation of Title 18, United States Code, Sections 1470 (sending obscene material to a minor), 2251 (Sexual Exploitation of Children) and 2252 (Certain activities relating to material involving the sexual exploitation of minors). As such, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

3.      The facts set forth in this affidavit are based upon my personal observations, my training and experience, my investigation of this case, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of, or investigation into, this matter.

4.      Unless otherwise specified, all dates set forth below are "on or about" the dates indicated, and all amounts or sums are approximate. Additionally, unless otherwise noted, wherever in this affidavit, it is asserted that a statement was made by an individual, that statement is described in substance, and in part, and is not intended to be a verbatim recitation of the entire statement.

5.      Based on my training and experience, and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 USC § 2251(a) (attempted production of child pornography), 18 USC § 1470 (sending obscene material to a minor), 18 USC § 2422(b) (enticement and attempted enticement of a minor) have been committed by GLENN MATTHEWS (05/XX/1989) and that historical cell site data and information pertaining to the **TARGET PHONE NUMBER** will yield evidence of these crimes.

6.      The Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).  As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, D.C.  *See* 18 U.S.C. § 3237.

**<u>PROBABLE CAUSE</u>**

7. On November 9, 2020, a concerned citizen made notification to the MPDC upon viewing an Instagram video that had been posted on a public Instagram page.

8. The video was a screen recording of a series of Instagram stories originally posted on W1's account. The screen recording was posted on a public Instagram account that featured local news stories. The video was approximately three minutes and thirty-four seconds long.

9. The video depicts Instagram account Southsidearea's profile page (SOUTHSIDEAREA). A female voice can be heard audibly stating, "Public service announcement- all the parents if your kids got Instagram." The video essentially depicts conversations between SOUTHSIDEAREA and Instagram account Makhyacuteface. During the conversations, SOUTHSIDEAREA tells the user of Makhyacuteface that he wants to show her himself "beat[ing] his dick." He tells her that he wants to see her face when he does it. The two accounts engage in a video chat and an adult male using SOUTHSIDEAREA is depicted masturbating on camera. The user of Mahkyacuteface does not activate her camera, but the user's profile picture is visible. The profile picture appears to depict a minor female. The video ends with the user of Makhyacuteface yelling at the SOUTHSIDEAREA, explaining that she is the mother of the owner of Makhyacuteface, and that he just masturbated to the profile picture of an 11-year old child.

10. On November 8, 2020, a citizen made contact with the MPDC to allege that the owner of SOUTHSIDEAREA account was a family member of hers.

11. Your affiant made contact with the citizen, who stated that the owner of SOUTHSIDEAREA was **Glenn Matthews**, date of birth May XX, 1989, who resided in Washington, D.C. (hereafter, "**MATTHEWS**"). The citizen reported that it had been

made aware of the video and, upon seeing it, immediately recognized the profile picture of SOUTHSIDEAREA as **MATTHEWS**, stating that it was the same photograph that **MATTHEWS** used on another known social media account. Furthermore, the citizen claimed that **MATTHEWS** had "always been a creep," and had been known to attempt to be inappropriate with young women on other forms of communication/chat. When the citizen attempted to speak with **MATTHEWS** in reference to the video, **MATTHEWS** blocked the phone number from further contact.

12. In an attempt to identify the owner of Makhyacuteface as well as the person confronting the user of **MATTHEWS**' Account in the video, administrative subpoenas for the subscriber information of the accounts, as well W1 Account, were requested. Pursuant to the subpoenas, your affiant was provided with a phone number attached to the W1 Account.

13. Law enforcement database queries of the phone number provided your affiant with the name and address of W1.  Database queries using W1's name and date of birth provided information confirming that W1 had a daughter that was 11-years-old at the time the video was produced.

14. Your affiant made contact with W1 on February 12, 2021. W1 confirmed that she had recorded the above-described video, and that the user of SOUTHSIDEAREA had been communicating with her daughter, (hereinafter MV-1), who has a date of birth in 2009. W1 alleged that other girls had also been chatting with the user of SOUTHSIDEAREA, that family members of **MATTHEWS** had contacted her to tell her that he was a predator, and that he knew the true age of MV-1 at the time the video chat occurred. W1 advised that she had deleted or blocked **MATTHEWS** from MV-1's account, but agreed

to provide screenshots of all communications. However, W1 was unable to produce the screenshots as of the date of this search warrant affidavit, and said that she had forgotten the login information for MV-1's account.

15. On April 7, 2021, your affiant obtained a federal search warrant in the District of Columbia authorizing the search of both **MATTHEWS**' account and MV-1's account. Your affiant reviewed the search warrant returns of both of the accounts and found the chat between **MATTHEWS**' account and MV-1's account was present only in the return for **MATTHEWS**' account. **MATTHEWS** initiated the chat on October 18, 2020. MV-1 asked for **MATTHEWS**' age and, upon seeing that **MATTHEWS** stated he was 31, told him, "Im to young for . You to be textinf me." **MATTHEWS** replied that they were only texting and nothing else. There was no direct mention of MV-1's age present in the chat, nor was there any mention of age on MV-1's profile.

16. During the review of **MATTHEWS**' Instagram account, your affiant observed multiple conversations that corroborated that the SOUTHSIDEAREA was in fact **MATTHEWS**' (DOB 05/XX/1989) account.  For example, your affiant observed that the account user frequently identified himself as Glenn, told several users he was from "dc," identified his age as 31, and, in one chat, sent a photograph of himself to another user, stating, "that's me."  Your affiant reviewed the photograph and the person in the photo appears to be the same individual depicted in a law enforcement database as **Glenn Matthews** (DOB 05/XX/1989).

17. While reviewing the search warrant return, your affiant observed that, along with the above-described incident involving MV-1, Matthews had sent at least nine different

users, all of whom identified themselves as minors, images of his penis and/or videos of himself masturbating.

18. In a conversation with MV-2 initiated on September 3, 2020 by MATTHEWS, MATTHEWS asked MV-2 if he could show her "something," and then explained it was a video of him masturbating. He then stated he would send pictures of his penis first. MATTHEWS then sent two pictures of his penis. Additionally, MATTHEWS told MV-2 that he from D.C. and asked if MV-2 also lived in D.C.  She said that she did. MATTHEWS later asked MV-2, "if I showed you my dick will you touch it?"  and "if I was there with you will you let me eat your pussy."  He asked if she was a "virgin" and asked again, "will you really let me eat your pussy?"  He mentioned meeting up multiple times.  At one point, he asked her if she could meet on Wednesday, asking her "what part dc you from?"  He continued to follow up on the meeting, sending a message on September 15, 2020 suggesting Anacostia Metro Station "for I can fuck that pussy."  In discussing the location for the meeting, MATTHEWS acknowledged MV-2's age stating, "Lol that's only place must I remind you you 15 I'm 31 I can take you to my house only place."  After MV-2 sent a voice message to MATTHEWS, MATTHEWS responded, "Naw cause that building is big as shit no lie I'm trying take you on the 11 floor and bust you on the Staircase."  MATTHEWS sent three additional videos of himself masturbating to MV-2.  MV-2 has been identified, resides in Washington D.C., has a date of birth in 2004, and was 15 at the time of the September 2020 conversations.  MV-2 was

interviewed and acknowledged that she was the person chatting with MATTHEWS.  She

stated that they did not actually meet up in person.

19. On November 1, 2020, MATTHEWS initiated a conversation with MV-3. Within the

first six messages, MV-3 told MATTHEWS, "I'm only 13 dumb asss." MATTHEWS

told MV-3 that they were only texting. On November 5, 2020, MATTHEWS asked MV-

3, "Can I show you something" and proceeded to explain, "it's a video me beating my

dick." MATTHEWS then sent a video of himself masturbating, and then sent an image of

his penis to MV-3, asking MV-3 if his penis is small.  MV-3 has been identified, resides

in Michigan, and has a date of birth in 2007.  She was interviewed and confirmed she was

sent the above-described video and image.

20. On November 2, 2020, MATTHEWS initiated a conversation with MV-4. MV-4 told

MATTHEWS she was 16 years old and MATTHEWS subsequently sent an image of his

penis stating, "that's my dick."  MV-4 stated, "Yuh know I'm 16 right" to which

MATTHEWS replied, "Come on now" "You wanted to see the dick right." The two

exchanged a series of explicit messages, and MATTHEWS then sent a video of himself

masturbating and stated, "Yea my dick hard thinking bout you I know your pussy going

taste good."

21. On July 27, 2020, MATTHEWS initiated a conversation with MV-5. He asked where she

was from and told her that he was from D.C.  MV-5 responded that she was from Kansas

but that she was going to D.C. the following summer.  MATTHEWS then stated, "Yea

wish I could see when you come dc."  MATTHEWS told MV-5 that he did not care about

age, stating he is 31. When MV-5 stated she was 15, MATTHEWS replied, "O ok idc if

we chill I got my own place know one will know."  MV-5 asked what they would do and

suggested she knew MATTHEWS would want to do more than put his arms around her if they met up.  MATTHEWS agreed, telling her he was "going to want to taste [her] pussy."  Several months later, on September 27, 2020, MV-5 and MATTHEWS exchanged messages, and MV-5 sent MATTHEWS a photograph of a female with a towel on, telling him that it was a photograph of her. MATTHEWS stated, "O yeah, that's a towel" and then told her, on October 2, "Need to take that towel off." "I need see what's under that towel."

22. That same day, as they continued to discuss meeting up, MATTHEWS (appearing to forget that she lived far away) told her he stayed at NE Benning Road area and asked if they could meet the following day.  MATTHEWS sent an image of his penis to MV-5. During the conversation, MATTHEWS asked MV-5, "show me something" on multiple occasions. MV-5 stated "ion send nudes," to which MATTHEWS replied that she had sent him a video of her masturbating. MV-5 insisted that the video was not her and, after a brief exchange, MV-5 sent an explicit video of a nude female stating, "Here damn." The female, whose face was obstructed, was masturbating. MATTHEWS stated, "That not you" and asked MV-5 to show her nails to prove that it was her, and MV-5 stated that the video was taken approximately one month before. MATTHEWS then told MV-5, "Make a video now." When MV-5 stated that she did not want to, MATTHEWS told her to "Send some more old shit."

23. On October 10, 2020, MATTHEWS made contact with MV-6. MV-6 told MATTHEWS that they were 11 years old and stated, "Bye u finna get block bitch BC u 31 and im 11." MATTHEWS then stated, "No" "hold up" and continued to say, "Can I show you something." When MV-6 replied yes, MATTHEWS stated, "It's a video me beating my

dick I'm bout send it to you now." MATTHEWS sent a video which MV-6 claimed to

not be able to view. MATTHEWS then sent another attachment which was a video of

himself masturbating.

24. On October 18, 2020, MATTHEWS initiated contact with MV-7. MV-7 disclosed her

age as 13 years old. MV-7 asked MATTHEWS, "show me the D." MATTHEWS

clarified, "you want see my dick" and MV-7 replied in the affirmative. MATTHEWS

then sent an image of his penis. MV-7 told MATTHEWS that his penis was small, and an

exchange occurred wherein MATTHEWS told MV-7 she was small and could not handle

his penis.  MV-7 replied that she was not small and MATTHEWS asked her to "show

proof" and then told her, "Let me see how fat your but." MV-7 declined to send

MATTHEWS any explicit media, but asked MATTHEWS to show her a video of him

ejaculating. MATTHEWS then sent a video of himself masturbating.  MV-7 was

identified and has a date of birth in 2010.  MV-7's mother confirmed that the account that

was utilized to contact MATTHEWS with the above-described chats was MV-7's

account.  However, MV-7's mother declined to have a forensic interview of MV-7 done

as of the date of this warrant.  She stated that no one would have had access to that

account other than MV-7 and MV-7's friends, all of whom were underage.

25. On August 20, 2020, MATTHEWS initiated contact with MV-8, who said that she was 9

years old. MATTHEWS claimed to be 22 years old, and told MV-8, "you cute to me sexy

I like you." MATTHEWS then engaged MV-8 in a conversation wherein he told her that

he wanted her to be "his," and that she could be his little girl and that she had to call him

"daddy." When MATTHEWS started to tell MV-8 what to do and what to say, MV-8

told him, "I don't like that," apologized, and stated that they could be friends because she

did not want to date a 22 year old. MATTHEWS replied, "You not dating me you going just text me and do what the fuck I say ok." When MV-8 told MATTHEWS no, MATTHEWS sent a screen shot of their conversation where MV-8 agreed to call him "daddy" and asked if he could post it. MV-8 threatened to block MATTHEWS, and MATTHEWS told her that he was going to show her a picture of his penis. MATTHEWS then sent an image of his penis.

26. On August 19, 2020, MATTHEWS initiated contact with MV-9. MATTHEWS told MV-9, "I want you to beat my dick for me."  When MV-9 told MATTHEWS, "I'm blocking you," a video call followed. MATTHEWS then sent screenshots of a conversation where MV-9 said she was 14 years old, and showing that MATTHEWS sent two videos of himself masturbating after learning MV-9's age. MATTHEWS asked MV-9 if he could post the photos, and MV-9 said, "no." MATTHEWS stated that he would not post it, "But you now going to text me every time I text you." When MV-9 said, "no" MATTHEWS stated that he was going to post the photos and send them to all of MV-9's friends.

27. On July 29, 2020, MATTHEWS initiated contact with MV-10, a 15-year old. MATTHEWS said that he was from D.C.  He asked where MV-10 was from and MV-10 said he lived in Alabama.  MATTHEWS disclosed to MV-10 that he is bisexual and likes both boys and girls. MV-10 told MATTHEWS not to hit on him or make moves because he is not gay. When MATTHEWS told MV-10 that he could not make that promise, MV-10 told him that they could be just friends or they can't talk. MATTHEWS and MV-10 engaged in a conversation about girls and masturbating. MATTHEWS told MV-10 why he liked being with boys, and then told MV-10 he was going to show him his penis.

MATTHEWS then sent MV-10 two images of his penis and a masturbation video. In the course of the chat, it appeared that MV-10 sent MATTHEWS a picture of his penis, as MATTHEWS replied, "Damn yea your dick big damn" in response to an attachment that was not viewable.

28. MV-10 then told MATTHEWS that he could tell that MATTHEWS had taken a screen shot of the photo he sent, and asked for MATTHEWS to send it to him. MATTHEWS then sent the screenshot, which appeared to be an image of MV-10's penis, to MV-10. MV-10 disclosed to MATTHEWS that he was about to masturbate, MATTHEWS told him, "make a video." MV-10 did not make any videos, and eventually blocked MATTHEWS, and then unblocked him. MATTHEWS told MV-10 not to block him again, and sent a screenshot which communicated to MV-10 that he knew who MV-10's friends were and threatened to send screenshots to them if MV-10 blocked MATTHEWS. MV-10 told him, "Im 15 n u doing this." MATTHEWS continued to order MV-10 to listen to MATTHEWS and do what he said. MV-10 told MATTHEWS that he would not block him, but would not do what he said. MATTHEWS replied, "You going do what the fuck I say you mine. If you don't I will send it to your family and friends screenshots" "say yes." The chat continued in a similar manner with MATTHEWS demanding that MV-10 do what he said and MV-10 refusing. MV-10 has been identified, has a date of birth in 2005, and resides in Alabama. MV-10 was interviewed and stated that his account was hacked and that he did not send any photos.

29. After reviewing the Instagram return, your Affiant attempted to locate MATTHEWS. During that process, your affiant discovered a MPD police incident from March 23, 2020 relating to MATTHEWS' girlfriend's five-year old child. As of the date of that report,

MATTHEWS reported his residence at 1116 21st Street, NE, Washington, D.C. On June 11, 2021, your affiant contacted MATTHEWS' girlfriend, pretending to be following up on this incident. She stated that MATTHEWS had been residing with her, but that they were no longer seeing each other as of that day. She provided his phone number as (202) 760-9248. On July 4, 2021 MATTHEWS reached out to your affiant utilizing the phone number associated with the Device. He reported that he was homeless and could meet your affiant anywhere to discuss the incident involving his girlfriend's child. On Monday, July 12, 2021, your affiant contacted MATTHEWS at the target phone number. MATTHEWS and your affiant agreed to meet on Thursday, July 15, 2021 at noon in Washington, D.C. at 5002 Hayes Street, NE. MATTHEWS indicated he would text or call your affiant when he arrived. However, MATTHEWS did not arrive at the scheduled date and time.

30.  On July 13, 2021 a search warrant was authorized by Hon. G. Michael Harvey, United States Magistrate Judge for the District of Columbia, for historical information as well as authorizing the collection of prospective geolocation information and pen register/trap and trace for telephone number 202-760-9248. This search warrant was served on T-Mobile on July 15, 2021, and prospective data began the following date.

31.  On or about July 17, 2021, the FBI received historical data relating to the 9248 above-described phone number.  However, that data only went back to April 1, 2021, the activation date on the account for this number for MATTHEWS.  Thus, it did not cover the offense conduct from July 27, 2020 through November of 2020 detailed above.

32. On July 22, 2021, members CEHTTF went to the residence at 1116 21st Street, NE, Washington, D.C. MATTHEWS' girlfriend answered the door. Agents asked if

MATTHEWS was there, and she initially denied it but eventually confirmed that he was there. She let law enforcement in the residence, where they found MATTHEWS and placed him under arrest pursuant to a federal arrest warrant for violations of 18 USC § 2251(a) and (e) (attempted production of child pornography), 18 USC § 1470 (sending obscene material to a minor), 18 USC § 2422(b) (enticement and attempted enticement of a minor) issued by U.S. Magistrate Judge Meriweather in the District of Columbia. MATTHEWS requested that his cellular phone be brought with him from the residence. The phone was located on a chair next to the bed where MATTHEWS had just been. Law enforcement gave MATTHEWS his Miranda rights after which he agreed to talk to law enforcement. He stated that his cell phone was 202-760-9248. He admitted that the SOUTHSIDEAREA Instagram account was his old Instagram account but stated that his phone had previously been stolen and that it had not been password protected so whoever had stolen the phone would have had access to everything on it.

33. Your affiant pulled prior police reports involving MATTHEWS as a part of the ongoing investigation to locate other possible phone numbers for MATTHEWS that he may have utilized during the criminal offenses described above.  Your affiant discovered a prior arrest report from September 16, 2020 (the same day on which MATTHEWS appears to have suggested meeting MV-2 at the Anacostia Metro Station for sex).  On that date, MATTHEWS had called police from Anacostia Metro Station utilizing the cellular number 202-926-5325 (the **TARGET PHONE NUMBER**).  When the police called him back, they observed him on camera speaking on a black cellular phone outside of the Anacostia Metro Station.  MATTHEWS ran from police when they approached, but they eventually caught up to him and retrieved the cell phone associated with the **TARGET**

**PHONE NUMBER** from him.  The police report notes that MATTHEWS yelled out, "that's my phone."  The account on the cell phone came back to MATTHEW'S girlfriend, the same girlfriend that he was found with at the time of his arrest in July of 2021.  The report noted that the girlfriend's account with T-Mobile had two lines, one of which MATTHEWS utilized.  It also noted that police returned the phone associated with the **TARGET PHONE NUMBER** to the girlfriend after this incident.

34.  Based on the above, there is probable cause to believe historical cell site data associated with the **TARGET PHONE NUMBER** will provide additional evidence of the criminal offenses herein, including MATTHEWS' travel to Anacostia Metro Station on or about the time and date he had suggesting meeting up with MV-2 for sex and his location at the time he sent the obscene material to various minors from July 27, 2021 through November 2020.  Historical information regarding this phone will also help identify locations where evidence is stored and where search warrants may be appropriate.

## CHARACTERISTICS OF INDIVIDUALS WITH A SEXUAL INTEREST IN CHILDREN AND CHILD PORNOGRAPHY COLLECTORS

1.     Based upon my knowledge, experience, and training in child exploitation and child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to individuals involved in the online enticement of children and collection of child pornography.

2.     Based on my training and experience, the training and experience of other agents, and the facts contained in this affidavit, I know that **GLENN MATTHEWS (05/XX/1989)** has a sexual interest in children and is a collector of child pornography. Characteristics common to people with a sexual interest in children include that they:

a.  Generally receive sexual gratification viewing children engaged in sexual activity and/or in sexually suggestive poses, such as seeing these children do so in-person or in photographs, other visual media, or from literature describing such activity.

b.  Generally collect sexually explicit or suggestive materials, in a variety of media, including in hard copy and/or digital formats. Persons with a sexual interest in children oftentimes use child pornography materials for their own sexual arousal and gratification. They may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse or groom a child to participate in sex, or to demonstrate the desired sexual acts. They may also use toys, games, costumes, sexual clothing, sexual paraphernalia, and children's clothing to lure or entice children. They may keep "trophies" or mementos of sexual encounters with children, or items that they use to gratify a sexual interest in children, such as by collecting children's underwear or other items belonging to a child.

c.  Almost always possess and maintain their "hard copies" of child pornographic material, that is, their pictures, films, videotapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location, such as their personal cellular phone, or on their person. Maintaining these collections in a digital or electronic format in a safe, secure and private environment, such as a cellular phone or on their person, allows persons who exploit children the

opportunity to safely maintain their collections for many years and enable them to frequently view the materials, which are valued highly.

d.  Your affiant knows that persons with a sexual interest in children generally maintain sexually explicit images of children in a safe, secure, and private environment, most often where they live, or in an office space, and/or on their person.   People with a sexual interest in children often transfer child pornographic material to multiple electronic devices because they value it so highly and because this transfer is sometimes necessary to create additional storage space. Additionally, because persons who collect child pornography are often compulsive about their activity, they often use multiple electronic devices throughout a home to access material depicting children or to communicate with children, especially when they have resided in the same place for a long period of time.  Child pornography images and videos can be downloaded onto desktop or laptop computers, computer disks, disk drives, data disks, system disk operating systems, magnetic media floppy disks, Internet-capable devices, cellular telephones, tablets, digital music players, and a variety of electronic data storage devices (hardware, software, diskettes, tapes, CDs, DVDs, SD cards, memory cards, USB/jump/flash memory devices, external hard drives, and other digital storage media).   The images/videos can be stored in both digital and hard copy format and are usually hidden so that they are not found by other members of the residence or by anyone else who enters the home.  Such hiding places could include but are not limited to offices, storage facilities, garages, sheds, attics, vehicles, bags,

and pockets. Digital files and devices may be password protected, encrypted, or otherwise protected.

e.   Persons who collect child pornography may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, screen names, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.  Such correspondence may take place, for example, through online bulletin boards and forums, Internet-based chat messaging, email, text message, video streaming, letters, cellular telephone, and in person.

3.    Based on my training and experience and my conversations with other investigators, child pornography collectors typically retain pictures, recordings, video tapes, photographs, magazines correspondence with likeminded individuals and/or victims, books, mailing lists, and child erotica, for many years. The nature of the materials, their attraction to the materials, and the risk involved with possessing and accessing such materials, motivates collectors of child pornography to keep their materials within their possession and control wherever they go. Because they place an extremely high value on their collection, they will take their collection with them if they move locations.

4.    Here, the evidence shows that **MATTHEWS** has communicated with at least ten different people who have identified themselves as minors and has sent obscene material to at least nine of those individuals.  **MATTHEWS** has also asked for images/videos of the minors, to include explicit material.  He has also suggested meeting up with minors for sex and engaged in

sexually graphic chats with them.   Based on the evidence and my training and experience, **MATTHEWS** has a sexual interest in children and is a collector of child pornography, and child pornography is likely to be found on the phone associated with the **TARGET PHONE NUMBER.**

## BACKGROUND ON CELL-SITE DATA AND LOCATION INFORMATION

35.     In my training and experience, I have learned that PROVIDER is a company that provides cellular telephone access to the general public.   I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or "cell tower/sector records."   E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.   [Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.   These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.   Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.   Accordingly, cell-site data is typically less precise that E-911 Phase II data.

36.     Based on my training and experience, I know that PROVIDER can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on PROVIDER's network or with such other reference points as may be reasonably available.

37.     Based on my training and experience, I know that PROVIDER can collect cell-site data about the Target Cell Phone.  Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication.  I also know that wireless providers such as PROVIDER typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

38.     Based on my training and experience, I know that each cellular device has one or more unique identifiers embedded inside it.  Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI").

39.     Based on my training and experience, I know that wireless providers such as PROVIDER typically collect and retain information about their subscribers in their normal course of business.  This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service.  I also know that wireless providers such as PROVIDER typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent

or received by a particular device and other transactional records, in their normal course of business.  In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **TARGET PHONE NUMBER**'s user or users.

40.     FBI's Cellular Analysis Survey Team (CAST) informed me that it is often beneficial to review at least 60 days of call detail records because they will establish a pattern of life and behavior. A smaller collection of records would make it difficult to determine if it is unusual for the phone(s) to appear in the areas where these crime(s) occurred.  Not only will this assist in determining if the phone(s) frequents the areas of the crime scene(s), but also whether the phone normally belongs in these areas because that is where the phone subscriber lives and/or works.  In this case, **MATTHEWS'** criminal activity dates back to July 27, 2020.  On that date and other dates including but not limited to those described in the probable cause section, he solicited child pornography as well as sent obscene material to minors.  The location data will help establish that he was in the District of Columbia when he committed these crimes.

## AUTHORIZATION REQUEST

41.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

42.     I further request that the Court direct PROVIDER to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

43.     Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, good cause exists under Rule 41 to permit the execution of the requested warrant at any time in the day or night.  Further, pursuant to 18 U.S.C.

§ 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## **CONCLUSION**

44.     I submit that this affidavit supports probable cause for a warrant to collect the

requested information about the location of the Target Telephone, as described in Attachment A,

and to seize the evidence described in Attachment B.

Respectfully submitted,

_____
Melia Dickinson
Detective, Metropolitan Police Department of
the District of Columbia

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on July 30, 2021

_____
G. Michael Harvey
UNITED STATES MAGISTRATE JUDGE

## <u>CERTIFICATE OF AUTHENTICITY OF DOMESTIC</u> <u>RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE</u> <u>902(11) AND 902(13)</u>

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by Verizon, and my title is _____.   I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of T-Mobile.  The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**.  I further state that:

a.       all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of T-Mobile, and they were made by T-Mobile as a regular practice; and

b.       such records were generated by T-Mobile's electronic process or system that produces an accurate result, to wit:

1.       the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Verizon, in a manner to ensure that they are true duplicates of the original records; and

2.       the process or system is regularly verified by T-Mobile, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.


Date                                                                    Signature